**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VITAS HEALTHCARE CORPORATION – MILPITAS** and **VITAS HEALTHCARE CORPORATION – WALNUT CREEK**<br>Plaintiffs,<br><br>v.<br><br>**NORRIS COCHRAN**<br>Acting Secretary, United States Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>Defendant. | Civil Case No. |

**COMPLAINT**

1. This is an action for judicial review of an arbitrary and capricious decision of the Secretary of the United States Department of Health and Human Services ("Secretary") that deprived plaintiff hospice providers, Vitas Healthcare Corporation – Milpitas ("Vitas-Milpitas") and Vitas Healthcare Corporation – Walnut Creek (Vitas-Walnut Creek") (collectively "Providers"), of reimbursement to which they were entitled, based on the erroneous calculation by Medicare of certain purported overpayments, in violation of the Medicare Hospice Cap Statute and Sequestration Statute. *See* 42 U.S.C. § 1395f(i)(2)(A) and 2 U.S.C. §906(d)(1)(A).

2. Providers bring this action to challenge a decision by the Provider Reimbursement Review Board (the "Board") that found certain erroneous reimbursement calculations made by the Medicare program to be proper. The Board is a five person board within the Centers for Medicare

& Medicaid Services ("CMS") that decides Medicare reimbursement disputes between healthcare providers, including hospices like Providers, and the Medicare program, on behalf of the Secretary.

3. As authorized under 42 U.S.C. § 1395x(dd), hospices provide end of life care benefits to Medicare beneficiaries who are terminally ill. *See* 42 C.F.R. Part 418. Under the Medicare program, hospices are paid on a per diem basis, subject to an annual limit on those payments. 42 C.F.R. § 418.307 *et seq*. Medicare Administrative Contractors ("MAC")[1] process payments for hospices and calculate the year-end limits to ensure hospices do not exceed a certain threshold amount, known as the hospice cap.

4. In this case, the applicable MAC incorrectly recalculated the hospice cap amounts for certain accounting years ending October 31, 2013, October 31, 2014, and/or October 31, 2015, for Vitas-Walnut Creek, Medicare provider number 05-1770, located in Walnut Creek, California, and Vitas-Milpitas, Medicare provider number 05-1746, located in Newark, California.

5. The Board's decision similarly is flawed since it erroneously affirms the MAC's recalculations and overpayment demands as proper despite clear error made by the MAC in addressing the payments made to the hospices under the Medicare statutes.

6. Medicare statutes require that the Medicare hospice cap be calculated based upon revenue that is *paid* to the hospice. 42 U.S.C. § 1395f(i)(2)(A); *see also* 42 C.F.R. § 418.308(a) (requiring that cap calculations be applied to payments made to hospices). The MAC incorrectly considered not just the actual amount paid during this time period, but also certain, additional sequestration

[1] The Secretary contracts Medicare payment and audit functions to administrative contractors (each known as a MAC) that determine payment amounts due to participating Medicare providers under Medicare laws and guidelines.

amounts that were never paid to the Providers when calculating the hospice cap and resulting amount owed. As calculated by the MAC, the overpayment assessments seek reimbursement of payments never received by the Providers.

7. Providers timely appealed the MAC's erroneous overpayment calculations by filing administrative appeals with the Board. Vitas-Milpitas filed Board appeal number 16-0119, disputing the MAC's calculations for accounting year ending October 31, 2013, and appeal number 16-0948, disputing accounting year ending October 31, 2014. Vitas-Walnut Creek filed Board appeal number 16-0949, disputing the MAC's calculations for accounting year ending October 31, 2014, and appeal number 16-2575, disputing accounting year ending October 31, 2015.

8. After briefing in the above appeals was completed, the Board consolidated the four separate appeals into a group appeal (19-2424GC), and in its decision, the Board erroneously agreed with the MAC and upheld overpayment calculations as if the sequestration amounts that were not paid to the Providers had in fact been paid.

9. This action seeks to overturn the Board's erroneous findings, and order that the MAC recalculate the Medicare hospice cap for these accounting years to consider only revenue that was actually paid to the Providers, and return the excess overpayment the MAC collected.

## THE PARTIES

10. Plaintiffs Vitas Healthcare Corporation – Milpitas and Vitas Healthcare Corporation – Walnut Creek, are commonly owned by Vitas Healthcare Corporation of California.

11. Defendant Norris Cochran, named in his official capacity, is Acting Secretary of the Department of Health and Human Services. The Board acts under authority delegated by the Secretary. 42 U.S.C. § 1395oo(a).

## JURISDICTION AND VENUE

12. Providers have exhausted their administrative remedies as described below.

13. Under 42 U.S.C. § 1395oo(f)(1) "[p]roviders shall have the right to obtain judicial review of any final decision of the Board . . . by a civil action commenced within 60 days of the date on which notice of any final decision by the Board . . . ***is received***." *See also* 42 C.F.R. § 405.1877(a)(2) ("[A] provider has a right to obtain judicial review of a final decision of the Board . . . by filing a civil action in accordance with the Federal Rules of Civil Procedure in a Federal district court with venue no later than 60 days ***after the date of receipt*** by the provider of a final Board decision.") (emphasis added).

14. The Board decision is dated February 7, 2020. The Providers have appealed within 60 days of their receipt of that decision.

15. At the time of issuance of the Board's decision on appeal, the Providers appointed representatives for the four administrative appeals (Nos. 16-0119, 16-0948, 16-0949, 16-2575), consolidated in appeal number 19-2424GC were Elizabeth Carder-Thompson, Lawrence Sher, and Rahul Narula of Reed Smith LLP ("Reed Smith").

16. As a result, the Board's decision should have been sent by mail or electronically transmitted to Ms. Carder-Thompson, Mr. Sher, and Mr. Narula at the following address:

Elizabeth Carder-Thompson, Esq.
Lawrence Sher, Esq.
Rahul Narula, Esq.
Reed Smith LLP
1301 K. Street NW
Suite 1000 – East Tower
Washington, DC 20005
Phone: (202) 414-9200
Fax: (202) 414-9299
Email: ECarder@reedsmith.com, LSher@reedsmith.com &
rnarula@reedsmith.com

17. On February 7, 2020, the Board published its decision for group appeal number 19-2424GC, which affirmed certain of the MAC's erroneous calculations for the 2013, 2014, and 2015 accounting years, for both Providers.

18. A review of Reed Smith's records, electronic data, its contacts with the Providers, and contacts with the above-named attorneys, reflect that neither Reed Smith, nor any of the Provider's appointed representatives, received the Board's decision in appeal 19-2424GC.

19. On information and belief, the Board, using its newly established electronic filing system, the Office of Hearings Case and Document Management System ("OH-CDMS"), [2] likely sent a copy of its decision by electronic mail only to Elizabeth Carder-Thompson. However, Ms. Carder-Thompson had retired from employment with Reed Smith in December 2019 – two months before the Board's decision was issued, and Ms. Carder-Thompson's email account was deactivated per Reed Smith's customary practice prior to the Board decision being rendered.

20. No other Reed Smith attorney who was an authorized representative for the Providers received notification of the decision and Reed Smith has no written or electronic record of having

[2] The OH-CDMS was implemented in August 2018, after Providers filed its Updated Appointment of Representative form authorizing the above attorneys to act in this matter. At the time of the Board's decision, up to and including the time this brief is filed, its use is not mandatory for providers and their representatives. Provider Reimbursement Review Board Rules Section 2.1, August 29, 2018.

received the decision. The Providers have no written or electronic record of having received the decision either. At the time of the purported transmittal of the decision, Reed Smith's practice was to reject emails sent to its former employees after the email address was deactivated, and to send a "bounce-back" notification of undeliverability to the sender.

21. The Administrator of the Centers for Medicare & Medicaid Services later declined to review the decision entered by the Board on March 18, 2020. To date, this decision is not publicly available, and Reed Smith only received notice of it when a MAC representative cited the declination in a different case's brief, involving a different party, in January of 2021. Subsequently, Reed Smith reached out to the Administrator to receive a copy of the declination to find that it had been sent by electronic mail to Elizabeth Carder-Thompson and Jennifer Pike, an attorney who had been substituted out of the case nearly two years before in 2018.

22. No Reed Smith attorney who was an authorized representative for the Providers at the time of the declination received notice of the Administrator's decision. The Providers also have no written or electronic record of having received the Administrator's decision.

23. Mr. Narula left Reed Smith in June of 2020, and turned the relevant appeals over to Ms. Lesley Reynolds before leaving his employment. Mr. Narula and Ms. Reynolds filed a hard-copy Notice of Substitution of Provider Representative with the Board at its office in Baltimore, Maryland, dated June 4, 2020. On behalf of Ms. Reynolds, a Reed Smith attorney followed up by emailing a PDF copy of the notice to Board representatives on June 4, 2020. The hard-copy notice was delivered to the Board by UPS on June 5, 2020.

24. Nobody from the Board contacted Mr. Narula or Ms. Reynolds to inform them that this case was already decided and closed. As of June 2020, Reed Smith's attorneys and the Providers

accordingly believed that the relevant appeals were open and active. They were waiting for the Board's resolution of the submitted disputes involving the MAC's erroneous overpayment calculations.

25. On December 3, 2020, while reviewing Board decisions in an independent, commercial database – the Wolters Kluwer "Cheetah" database – Reed Smith's attorneys first discovered the Board's decision involving the relevant appeals. This action for judicial review accordingly is filed within sixty days of the date that Providers obtained actual notice of the final Board decision for consolidated case number 19-2424GC as required by 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1877(a)(1).

26. The Court has jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 1395oo(f)(1). Providers are also entitled to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, including 5 U.S.C. §§ 703, 704 and 706; and the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202.

27. Venue in the United States District Court for the District of Columbia is proper under 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(e).

## LEGAL BACKGROUND

### Hospice Payment and the Hospice Cap

28. Medicare Part A has included a hospice benefit to provide end-of-life care to terminally ill patients since 1982. *See* 42 U.S.C. § 1395c, *et seq.*

29. Medicare pays hospice care providers under a hybrid reimbursement system that prospectively covers all aspects of a patient's hospice care, subject to an annual cap. 42 C.F.R. § 418.307 *et seq*. The hospice submits Medicare claims that identify the Medicare beneficiary, the dates of service, and the level of care provided. *See* Medicare Claims Processing Manual ("MCPM") (Pub. 100-04) Chapter 11, Part 30. MACs process and pay these claims based on the appropriate rate for the location and level of care provided. *See* MCPM, Ch. 11, § 30.2. At the end of the accounting year, hospices report these aggregated payments on a Provider Statistical and Reimbursement Report ("PS&R"), and the MAC conducts a hospice specific cap-year-end reconciliation. *See* Medicare Benefit Policy Manual ("MBPM") (Pub. 100-02) Chapter 9, Part 90.

30. The hospice cap is established at 42 U.S.C. § 1395f(i)(2)(A). In particular, the statute states:

> The *amount of payment made* under this part … for hospice care provided by… a hospice program for an accounting year may not exceed the "cap amount" for the year (computed under [42 U.S.C. § 1395f (i)(2)(B)]) multiplied by the number of Medicare beneficiaries in the hospice program in that year….

(emphasis added). The statute thus mandates that the hospice cap be calculated by placing limits on the "amount of payment made" to a hospice.

31. The implementing regulation for this statute, 42 CFR § 418.308(a), states:

> Except as specified in paragraph (b) of this section [42 CFR § 418.308], *the total Medicare payment* to a hospice for care furnished during a cap period is limited by the hospice cap amount specified in § 418.309.

(emphasis added). Similar to 42 U.S.C. § 1395f(i)(2)(A), this regulation requires that the cap be applied to "the total Medicare payment to a hospice."

32. The statutory and regulatory definitions clearly require that the hospice cap be calculated with reference to revenue that was *actually paid* to the hospice care provider during the time period

in question.

33. When total actual Medicare payments made to a hospice for an accounting year exceed its aggregate cap for the period, the excess payment made is an overpayment, which must be returned to Medicare. 42 C.F.R. § 418.308(d). The MACs seek collection of this overpayment by issuing a Notice of Review of the Hospice Cap Amount to the providers.

34. A provider may appeal the MAC's overpayment demand to the Board if the provider is dissatisfied with the MAC's hospice cap determination. 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 418.311, 405.1835. The Providers here timely appealed the MAC's overpayment demands to the Board.

**<u>The Application of Sequestration to Hospice Payments</u>**

35. In 2011, Congress adopted the Budget Control Act of 2011 ("Act"), which required the President to reduce discretionary spending, including Medicare spending, by certain fixed percentages in the event that budgeted expenditures exceeded certain limits. This process is known as "sequestration." The "sequestration" percentage reduction for the Medicare program is capped at two percent for a fiscal year and applies "in the case of [Medicare] parts A and B . . . *to individual payments for services*. . ." 2 U.S.C. § 906(d)(1)(A) (*emphasis added*).

36. On March 1, 2013, President Barack Obama issued a sequestration order, requiring that submitted Medicare claims with dates of service on or after April 1, 2013 be paid with a 2% sequestration deduction. Consistent the Presidential Order, CMS directed its Medicare contractors to reduce Medicare payments with dates of services or dates of discharge on or after April 1, 2013 by 2 percent. *See* CMS Medicare FFS Provider e-News (March 8, 2013), available at

https://www.cms.gov/Outreach-and-Education/Outreach/FFSProvPartProg/Provider-Partnership-Email-Archive-Items/2013-03-08-standalone.html?DLPage=1&DLEntries=10&DLFilter=2013-03&DLSort=0&DLSortDir=descending (last accessed January 21, 2021).

37. To apply sequestration, MACs began applying a 2% reduction to per diem payments made to hospices effective with dates of service on or after April 1, 2013.

38. The sequestration statute is clear that sequestration results in reductions "to individual payments for services furnished." 2 U.S.C. § 906(d)(1)(A). Accordingly, for Part A claims, including hospice claims, sequestration adjustments should be made and reported on the remittance advice at the individual claims level.

39. On its PS&R, a hospice submits its aggregate gross reimbursement for a given accounting year, as well as the amount of any applicable sequestration or other reductions to its reimbursement during that same time period. The PS&R thus reflects the hospice's aggregate net reimbursement for the applicable time period, which is calculated as the gross reimbursement less sequestration and other reductions. The net reimbursement is therefore the sum of the actual individual Medicare payments for services made to the hospice for the given time period, after sequestration.

40. The MAC issued guidance on July 31, 2015 that indicated it would calculate hospice cap liability in direct contravention of the statutory and regulatory scheme for hospice cap calculation and sequestration. The MAC guidance stated:

- The sequestration amount reported on the Provider Statistical and Reimbursement (PS&R) report for each hospice shall be added to the net reimbursement amount reported on the PS&R.
- The resulting amount shall be compared to the hospice's aggregate cap amount to calculate a pre-sequester overpayment, and

- The pre-sequester overpayment shall be reduced by 2% percent to reflect the actual amount paid to the hospice. The 2% overpayment reduction cannot be greater than the actual sequestration amount reported on the PS&R report.

*See* Palmetto GBA, *Sequestration: Impact on Hospice Aggregate Cap Calculation* (July 31, 2015).

41. Implementation of the MAC's revised hospice cap methodology directly contradicts the statutory interpretation CMS (then the Health Care Financing Administration) issued when it promulgated 42 C.F.R. § 418.308(a). In response to comments opposing the hospice cap, CMS explained:

> We would also point out that *all reimbursement to a hospice for hospice services, as defined in section 1861(dd)(1) of the Act, is subject to the cap…. We believe it is clear from the legislative history that the cap is intended to capture all costs associated with hospice care*. For example, the committee report (H. Rep. No. 98-333, 98th Cong., 1st Sess., 1, (1983)) that accompanied the amendment that raised the cap to $6,500 stated explicitly that the "* * * *intent of the cap was to ensure that payments for hospice care would not exceed what would have been expended by Medicare if the patient had been treated in a conventional setting.*" Exempting some services from the cap would circumvent this intention.

48 Fed. Reg. 56008, at 56019 (Dec. 16, 1983) (emphasis added).

42. CMS's explanation in the 1983 Final Rule demonstrates that CMS interpreted the hospice cap to apply only to payments actually made to the hospice. CMS specified that the hospice cap applies to "reimbursement… for hospice services" and "costs associated with hospice care." CMS also recognized that this was Congress's intent as well. Specifically, Congress's statement that the "*intent of the cap was to ensure that payments for hospice care would not exceed what would have been expended by Medicare if the patient had been treated in a conventional setting*" establishes Congress's rationale for establishing the cap – to limit costs *expended by Medicare*. Congress never intended for the cap to apply to phantom payments or costs *not* expended by

Medicare. But, that is exactly what the MAC's recalculation has accomplished by inappropriately applying the cap to include unpaid sequestered amounts that Medicare never expended.

43. For over 30 years, CMS followed its own interpretation of 42 C.F.R. § 418.308(a), which was consistent with Congressional intent. Then, in 2015, CMS through its MAC, unjustly overreached, and without authority, recalculated cap amounts to include unpaid sequestered amounts causing further hardship to hospices that already were struggling to deal with the effects of the sequestration cuts.

**<u>The MAC's Methodology Violates the Sequestration Statute</u>**

44. Under the Congressional sequestration authority, "the percentage [sequestration] reduction that shall apply … in the case of [Medicare] parts A and B of such title, to *individual payments* for services furnished … [must be] such that the reduction made in payments under that order shall achieve the required total percentage reduction in those payments for that period." 2 U.S.C. § 906(d)(1)(A) (emphasis added). Congress required the sequestration reduction to apply to *individual payment*s for provider services furnished. Contrary to the clear mandate of this provision, however, the MAC, through its inappropriate recalculation has unlawfully applied the sequestration reduction to Providers' *overall* payment limitation, *in addition to the sequestration reduction that was already applied by CMS to Providers' individual payments.* Sequestration reductions are to be made to revenue for individual services rendered to patients, *i.e.*, per procedure or per patient day payments.

45. Sequestration authority provides that "[r]eductions in payments for programs and activities under such title XVIII pursuant to a sequestration order … shall be *at a uniform rate, which shall not exceed [2] percent*, across all such programs and activities subject to such order." 2 U.S.C.

§ 906(d)(2) (emphasis added). The MAC can only comply with the applicable statute and regulations by applying the sequestration reductions in a uniform manner to all hospices to payments made to hospices only, and not to the hospice cap. Indeed, applying this sequestration reduction to both the per diem payments and the hospice cap amount renders the reductions contrary to statute, as rather than applying uniformly to all hospices, only hospices whose costs exceeded the hospice cap are subjected to an additional discount.

**CMS Has Not Sought to Properly Amend the Application of Sequestration to Hospice Payments**

46. Congress has periodically amended how the hospice cap amount is to be calculated. Most recently, Congress amended the statutory cap formula to reflect certain productivity adjustments mandated by the Affordable Care Act. *See* Improving Medicare Post-Acute Care Transformation Act of 2014, Pub L No. 113-185, § 3(d) (2014).[3]

47. Congress likewise has the authority to specify that any sequestration cuts should be "added back" for purposes of calculating the hospice cap – but Congress has not exercised that authority.

48. Upon information and belief, CMS has never promulgated any regulatory action under its own authority seeking public comment on the permissibility of using a revised methodology to include unpaid sequestered amounts within the calculation of a hospice's annual cap amount. Absent such explicit authority from Congress or, official notice and comment rulemaking, the MAC may not utilize its revised recalculation methodology.

[3] While Congress has periodically made changes to the Hospice Cap Statute, it has not changed the requirement that the cap be calculated based on *payments made* to the hospice.

**The Revised Methodology is Contrary to Law, Arbitrary and Capricious, and Fundamentally Unfair**

49. As described in detail above, the MAC and CMS are prohibited from applying the hospice cap to sequestered amounts that were never paid to Providers. Doing so places an undue, unfair and unanticipated financial burden on Providers.

50. The MAC and CMS have applied the revised methodology published in MAC guidance on July 31, 2015 to accounting years ending October 31, 2013 and October 31, 2014. By retroactively applying its revised methodology, the MAC and CMS eliminated any opportunity Providers may have had to plan for the additional financial hardship imposed by the MAC's revised methodology.

51. There is no statutory or regulatory authority for adding in the savings to the government attributable to sequestration – dollars never paid to the hospice – to arrive at a hypothetical pre-sequestration amount, then calculating the cap liability based on that phantom figure.

**FACTS**

52. This case's administrative record establishes the facts below. The Providers at issue herein are Medicare-participating hospices that received one or more cap overpayment determinations from their MAC for Cap Years 2013, 2014 and 2015.

| Provider Name | Provider Number | Fiscal Year Ending |
|---|---|---|
| **Vitas Healthcare Corporation – Milpitas** | 05-1746 | 10/31/2013 |
| **Vitas Healthcare Corporation – Milpitas** | 05-1746 | 10/31/2014 |
| **Vitas Healthcare Corporation – Walnut Creek** | 05-1770 | 10/31/2014 |
| **Vitas Healthcare Corporation – Walnut Creek** | 05-1770 | 10/31/2015 |

53. The MAC initially correctly calculated Vitas-Milpitas' 2013 cost year cap overpayment determination. However, the MAC subsequently recalculated this cap overpayment determination, and sent Revised Notices of Review of the Hospice Cap Amount to Vitas-Milpitas, demanding additional overpayment amounts. For the Providers with cost reporting years in 2014 and 2015, the MAC issued Notices of Effect of Inpatient Day Limitation and Hospice Cap Amounts, as well as multiple Revised Notices of Review of Hospice Cap Amounts. The methodology that accompanied the Initial Notices for 2014 and 2015 years, as well as all of the Revised Notices for the 2013, 2014, and 2015 cap years, received from by the Providers are consistent with the methodology published in the MAC's July 31, 2015 guidance.

54. The following example describes the impact of the MAC's erroneous calculations on Providers. The MAC's May 7, 2015 Notice of Review of the Hospice Cap Amount to Vitas-Milpitas for the cap year ending October 31, 2013, included a purported overpayment of $707,857. The MAC calculated this overpayment amount after adding the $575,884 sequestration amount, which Vitas-Milpitas never received, to the amount paid to provider.

55. The proper overpayment demand for Vitas-Milpitas, however, should be calculated by subtracting the total cap amount of $45,721,583 from the actual payments, net of sequestration, made to the hospice of $49,377,519 for a total cap overpayment of $3,655,935. Here, Vitas-Milpitas and the MAC had already recognized an overpayment of $3,438,990, leaving a balance of an actual overpayment of $216,946.

56. Accordingly, in the May 7, 2015 first revised determination request, the MAC is seeking an excess overpayment amount of $490,911, which is the difference between the $707,857 erroneous overpayment demanded by the MAC, and the properly calculated overpayment of

$216,946, based only on payments actually made.

57. On October 16, 2015 Vitas-Milpitas properly and timely appealed the MAC's erroneously calculated overpayment demand to the Board.

58. Subsequently, on January 5, 2016 and June 6, 2017, the MAC again revised the cap amounts, due to a change in the "Medicare Beneficiaries Count." Using the same flawed methodology that the MAC used in its first determination (which includes the sequestration amount of $575,884 as described above in the "amount paid to the provider"), the MAC calculated additional overpayments of $164,853 and $23,845 that would be due from Provider. While the sequestration amount did not change with respect to these subsequent determinations, the overpayment amounts sought by the MAC in these determinations used the same flawed methodology as challenged by Vitas-Milpitas in its initial appeal.

59. Upon information and belief, the impact of the MAC's improper methodology for this appeal totals $679,609. Vitas-Milpitas properly added these amounts to its pending appeal before the Board.

60. Notwithstanding the clear language in the statute, the regulation, and published guidance, the MAC added unpaid sequestration amounts into every cap overpayment calculation at issue in the underlying Board appeals and in this Complaint. The overpayments were timely appealed by the Providers for the other cap years and follow a similar trajectory as summarized in the chart below:

| | Vitas-Milpitas 10/31/2013 | Vitas-Milpitas 10/31/2014 | Vitas-Walnut Creek 10/31/2014 | Vitas-Walnut Creek 10/31/2015 | |
|---|---|---|---|---|---|
| Actual Payments to hospice | 49,377,519 | 46,794,759 | 30,753,822 | 33,138,999 | |
| Hospice Cap | 45,721,583 | 43,181,396 | 29,352,940 | 33,582,752 | |
| Difference = Overpayment | 3,655,936 | 3,613,363 | 1,400,882 | -443,753 | |
| Previously Recognized Overpayment | 3,438,990 | 3,351,158 | 1,213,924 | 0 | |
| Difference = properly calculated Overpayment | 216,946 | 262,205 | 186,958 | none | |
| MAC's Initial Overpayment | 707,857 | 1,125,833 | 774,022 | 227,908 | |
| Difference = Amount Demanded in Error | 490,911 | 863,628 | 587,064 | 227,908 | |
| First Additional Demand | 164,853 | 227,793 | 117,840 | 112,284 | |
| Second Additional Demand | 23,845 | 96,658 | 15,845 | 68,965 | |
| Total Effect | 679,609 | 1,188,079 | 720,749 | 409,157 | 2,997,594 |

61. The MAC has already collected these erroneous overpayments from the Providers.

## STATEMENT OF CLAIMS FOR RELIEF

## COUNT ONE

**(Agency Action That Is Arbitrary, Capricious, Contrary to Law, and Unsupported by Substantial Evidence Under 5 U.S.C. § 706)**

62. The allegations set forth above are realleged and incorporated by reference.

63. Under the APA a reviewing court may set aside agency action that exceeds an agency's statutory authority or that is contrary to law, arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706.

64. The MAC erred in incorporating unpaid sequestration amounts in violation of the Hospice Cap and Sequestration Statutes. This error was arbitrary, capricious, and contrary to law.

65. The MAC erred in recalculating the Providers' hospice cap, and the Board erred by approving the MAC's erroneous calculations in the Board's February 7, 2020 decision, as the methodology employed by the MAC was arbitrary, capricious, and contrary to law.

## COUNT TWO

**(Agency Action That Violates Due Process Under 5 U.S.C. § 706)**

66. The allegations set forth above are realleged and incorporated by reference.

67. The Administrative Procedure Act invalidates any decision that is reached in violation of a party's rights set forth in the United States Constitution, which includes the right to due process. See 5 U.S.C. § 706(b). Further, an agency must follow clear statutory mandates and its own

regulations and rules. If the agency's violation of its own rules results in prejudice to a party, then the agency's decision is "tainted" and cannot stand.

68. Based on CMS's disregard of its statutory mandates, as well as its own reimbursement rules and procedures regarding calculation of the hospice cap, the Board's decision is a violation of constitutional due process and of its own agency rules. It is thus arbitrary, capricious, an abuse of discretion, and not in accordance with law, and must be reversed and set aside under 5 U.S.C. § 706.

## REQUEST FOR RELIEF

69. Providers respectfully request that this Court enter an order and judgment that:

(a) Reverses and sets aside the Board's decision as arbitrary, capricious, and contrary to law; unsupported by substantial evidence; and in violation of due process;

(b) Reverses and sets aside the Board's decision, declaring that the MAC's hospice cap overpayment determinations issued to the Providers are invalid and set aside, and ordering that the MAC recalculate Providers' hospice cap determinations by comparing each Provider's annual aggregate payments made for each accounting year to its annual aggregate cap for each accounting year as required by statute;

(c) Requires the Secretary promptly to return to Providers the portions of the cap overpayment collected from Providers attributable to the improper inclusion of sequestered funds in the hospice cap determinations;

(d) Awards Providers interest on any received reimbursement, based on 42 C.F.R. § 405.378, from the date of each recoupment of overpayment to the present;

(e) Enjoins the Secretary and its contractors from including sequestration reductions in cap overpayment calculations for the Providers for any cap year; and

(f) Awards any other relief as may be warranted at law or in equity.

Dated: January 29, 2021

Respectfully submitted,

By: */s/ Lesley C. Reynolds*

Lesley C. Reynolds (D.C. Bar No. 487580)
Frederick Robinson (D.C. Bar No. 367223)
Email: lreynolds@reedsmith.com
Email: frobinson@reedsmith.com
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005-3373
Phone (202) 414-9200
Fax (202) 414-9299

James Martin (PA Bar No. 204336)
(*pro hac vice motion to be filed*)
Email: jcmartin@reedsmith.com
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Phone (412) 288-3131
Fax (412) 288-3063

*Counsel for Providers*